# No. 12-16601

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

### FOX TEST PREP AND STEVEN PRICE

Plaintiffs/Appellants,

*v.*

### FACEBOOK, INC.

Defendant/Appellee.

---

*On Appeal from the United States District Court*
*for the Northern District of California, Case No. C -09-3043 PJH*
*The Honorable Phyllis J. Hamilton, United States District Judge*

---

## ANSWERING BRIEF OF DEFENDANT-APPELLEE
## FACEBOOK, INC.
## <u>REDACTED VERSION</u>

---

Kristin Linsley Myles
Jonathan H. Blavin
Michael J. Mongan
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, CA 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

Michael G. Rhodes
Whitty Somvichian
COOLEY LLP
101 California Street
Fifth Floor
San Francisco, CA 94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

Attorneys for Defendant/Appellee
FACEBOOK, INC.

## CORPORATE DISCLOSURE STATEMENT

Facebook, Inc. states that it is a corporation organized under the laws of Delaware, and that no parent corporation or publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................1

STATEMENT OF JURISDICTION ..............................................5

STATEMENT OF THE ISSUES ..................................................5

STATEMENT OF THE CASE AND OF THE FACTS ..................6

I.     Facebook And Its Advertising Practices ..........................6

     A.    Facebook's Services............................................6

     B.    Facebook's Advertising Channels ......................6

     C.    Facebook's "Click" Systems..............................8

     D.    Information Available to Facebook Advertisers...............11

     E.    IAB Guidelines.................................................12

II.    Named Plaintiffs ............................................................13

     A.    Fox Test Prep ....................................................13

     B.    Stephen Price ....................................................14

III.   Proceedings Below .........................................................14

     A.    Plaintiffs' Complaint ........................................14

     B.    The District Court's Denial of Class Certification ...........15

SUMMARY OF ARGUMENT ....................................................19

STANDARD OF REVIEW ..........................................................21

ARGUMENT ..............................................................................22

I.     The District Court Acted Well Within Its Discretion In Holding That Common Issues Do Not Predominate And That A Class Action Is Not Superior ........................................................................22

     A.    Plaintiffs Failed to Carry Their Burden of Establishing That Common Contract Questions Predominate.......................................23

           1.    Plaintiffs did not establish a uniform contract........................24

           2.    The district court did not err by considering merits issues that overlapped with the Rule 23 inquiry ................................34

B.   The District Court Acted Within Its Discretion in Finding That Plaintiffs Failed to Establish a Classwide Methodology for Determining Liability and Damages ..................................................38

     1.   Plaintiffs did not carry their burden of demonstrating a workable methodology ..............................................................38

     2.   Facebook's evidence further supported the court's conclusion that individualized questions predominate ...........42

     3.   Plaintiffs' remaining arguments related to liability and damages have no merit ........................................................45

II.   The District Court Acted Within Its Discretion In Holding That Price And Fox Did Not Establish That They Were Adequate Representatives ................................................................................48

   A.   Price and Fox Are Subject to Unique Defenses ...............................48

   B.   Price and Fox Have Unique Interests ...............................................52

   C.   Fox Lacked Sufficient Knowledge to Serve As Class Representative ....................................................................................55

CONCLUSION .................................................................................................57

STATEMENT OF RELATED CASES ............................................................59

CERTIFICATE OF COMPLIANCE ...............................................................60

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Adams v. Kansas City Life Insurance Co.*,
   192 F.R.D. 274 (W.D. Mo. 2000)................................................................28

*American Pipe & Construction Co. v. Utah*,
   414 U.S. 538 (1974)................................................................37

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997)................................................................52, 53

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
   ___ U.S. ___, No. 11-0085, slip op. (2013), 2013 WL 691001 ....................2, 36

*Andrews Farms v. Calcot, Ltd.*,
   2009 WL 1211374 (E.D. Cal. May 1, 2009) ................................................53, 54

*Avritt v. Reliastar Life Insurance Co.*,
   615 F.3d 1023 (8th Cir. 2010) ................................................27, 30

*Berger v. Compaq Computer Corp.*,
   257 F.3d 475 (5th Cir. 2001) ................................................56, 57

*Bohannon v. Allstate Insurance Co.*,
   847 F.2d 740 (11th Cir. 1988) ................................................24, 37

*Buckley v. Terhune*,
   441 F.3d 688 (9th Cir. 2006) ................................................29

*Californians for Disability Rights, Inc. v. Cal. Dep't of Transportation*,
   249 F.R.D. 334 (N.D. Cal. 2008) ................................................55, 56

*Coopers & Lybrand v. Livesay*,
   437 U.S. 463 (1978)................................................................36

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993)................................................................45

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Duchardt v. Midland National Life Insurance Co.*,
265 F.R.D. 436 (S.D. Iowa 2009)................................................................28

*Elliott Industries Ltd. Partnership v. BP America Production Co.*,
407 F.3d 1091 (10th Cir. 2005) ................................................31, 32

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ....................................................*passim*

*Funeral Consumers Alliance, Inc. v. Service Corp. International*,
695 F.3d 330 (5th Cir. 2012) ...............................................................47

*Gregurek v. United of Omaha Life Insurance Co.*,
2009 WL 4723137 (C.D. Cal. Nov. 10, 2009) ..................................27

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .............................................................48

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ...............................................48, 49, 51

*Hewitt v. Joyce Beverages of Wisconsin, Inc.*,
721 F.2d 625 (7th Cir. 1983) .......................................................24, 37

*In re Beer Distribution Antitrust Litigation*,
188 F.R.D. 549 (N.D. Cal. 1998) .......................................................54

*In re GPU Antitrust Litigation*,
253 F.R.D. 478 (N.D. Cal. 2008) .................................................41, 53

*In re Hydrogen Peroxide Antitrust Litigation*,
552 F.3d 305 (3d Cir. 2008) ..........................................................44, 45

*In re Initial Public Offerings Securities Litigation*,
471 F.3d 24 (2d Cir. 2006) ..................................................................45

*In re Live Concert Antitrust Litigation*,
863 F. Supp. 2d 966 (C.D. Cal. 2012)................................................45

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re Live Concert Antitrust Litigation*,
   247 F.R.D. 98 (C.D. Cal. 2007)................................................................56

*J.H. Cohn & Co. v. American Appraisal Associates, Inc.*,
   628 F.2d 994 (7th Cir. 1980) ...........................................................48, 49

*Keegan v. American Honda Motor Co.*,
   284 F.R.D. 504 (C.D. Cal. 2012).....................................................55, 56

*Lane v. Facebook, Inc.*,
   696 F.3d 811 (9th Cir. 2012) ..................................................................47

*Martinez v. Welk Group, Inc.*,
   2012 WL 2888536 (S.D. Cal. July 13, 2012)...................................24, 37

*Mazza v. American Honda Motor Co., Inc.*,
   666 F.3d 581 (9th Cir. 2012) ........................................21, 23, 38, 42

*Moeller v. Taco Bell Corp.*,
   220 F.R.D. 604 (N.D. Cal. 2004) ..........................................................57

*New Directions Treatment Services v. City of Reading*,
   490 F.3d 293 (3d Cir. 2007) ..................................................................56

*Parkhill v. Minnesota Mutual Life Insurance Co.*,
   188 F.R.D. 332 (D. Minn. 1999) ...........................................................28

*Ritti v. U-Haul International, Inc.*,
   2006 WL 1117878 (E.D. Pa. Apr. 26, 2006).........................................52

*Rodman v. Safeway, Inc.*,
   2011 WL 5241113 (N.D. Cal. Nov. 1, 2011).........................................30

*Rodman v. Safeway, Inc.*,
   No. 11-03003 (N.D. Cal. June 17, 2011).................................................31

*Sacred Heart Health Systems, Inc. v. Humana*,
   601 F.3d 1159 (11th Cir. 2010) ..............................................................27

# TABLE OF AUTHORITIES
## (continued)

**Page**

*SCC Alameda Point LLC v. City of Alameda*,
___ F. Supp. 2d ___, 2012 WL 4059884 (N.D. Cal. Sept. 14, 2012) ...............28

*Smilow v. Southwestern Bell Mobile Systems, Inc.*,
323 F.3d 32 (1st Cir. 2003)....................................................................26

*Stearns v. Ticketmaster Corp.*,
655 F.3d 1013 (9th Cir. 2011) ...............................................................37

*Sussman v. American Broadcasting Companies, Inc.*,
186 F.3d 1200 (9th Cir. 1999) .........................................................34, 54

*Tourgeman v. Collins Financial Services, Inc.*,
2011 WL 5025152 (S.D. Cal. Oct. 21, 2011)......................................51

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011)................................................................*passim*

*Welling v. Alexy*,
155 F.R.D. 654 (N.D. Cal. 1994) ........................................................49

*Williams v. Oberon Media, Inc.*,
2010 WL 8453723 (C.D. Cal. Apr. 19, 2010)...............................51, 52

*Windham v. American Brands, Inc.*,
565 F.2d 59 (4th Cir. 1977) .................................................................41

*Woods v. Google Inc.*,
2011 WL 3501403 (N.D. Cal. Aug. 10, 2011) ...................................30

**STATE CASES**

*Avery v. State Farm Mutual Automobile Insurance Co.*,
216 Ill. 2d 100 (2005) ....................................................................25, 38

*Badie v. Bank of America*,
67 Cal. App. 4th 779 (1998) ...............................................................29

# TABLE OF AUTHORITIES
## (continued)

Page

*Brawthen v. H & R Block, Inc.*,
   28 Cal. App. 3d 131 (1972) ..................................................................25

*Cutler v. Wal-Mart Stores, Inc.*,
   175 Md. App. 177 (2007) ...................................................................25

*Guz v. Bechtel National, Inc.*,
   24 Cal. 4th 317 (2000) .......................................................................33

*Hayter Trucking, Inc. v. Shell Western E&P, Inc.*,
   18 Cal. App. 4th 1 (1993) ............................................................31, 32

*Pacific Gas & Electric Co. v. Zuckerman*,
   189 Cal. App. 3d 1113 (1987) ............................................................29

*Racine & Laramie, Ltd. v. Department of Parks & Recreation*,
   11 Cal. App. 4th 1026 (1992) .............................................................33

*Shaw v. Regents of the University of California*,
   58 Cal. App. 4th 44 (1997) .................................................................25

*Smith v. Adventist Health System/West*,
   182 Cal. App. 4th 729 (2010) .............................................................28

*Tomaselli v. Transamerica Insurance Co.*,
   25 Cal. App. 4th 1766 (1994) ........................................................32, 33

**FEDERAL STATUTES**

28 U.S.C.
   § 1292(e) ..............................................................................................5

   § 1332(d) ..............................................................................................5

**STATE STATUTES**

Cal. Bus. & Prof. Code §§ 17200 *et seq.* ...............................................14

# TABLE OF AUTHORITIES
## (continued)

Page

**FEDERAL RULES**

Federal Rules of Civil Procedure

23 ...................................................................................*passim*

23(a) ..............................................................................21, 52

23(a)(1) .................................................................................19

23(a)(2) .................................................................................19

23(a)(3) ......................................................................19, 48, 54

23(a)(4) ..........................................................................*passim*

23(b) ..............................................................................21, 52

23(b)(3) ..........................................................................*passim*

23(b)(4) ...................................................................................2

23(f) ........................................................................................5

Federal Rule of Evidence 702.............................................46

**TREATISES**

1 Newberg on Class Actions (5th ed. 2012).....................54, 56

# INTRODUCTION

This putative class action involves the sale of advertising by Defendant/Appellee Facebook, Inc. ("Facebook"). Two named Plaintiffs, who collectively purchased approximately $1,500 in "cost-per-click" advertising from Facebook in 2009, moved to certify a class of more than 100,000 Facebook advertisers. Their theory was that Facebook breached its contracts with advertisers by not sufficiently screening out what they claimed were "invalid" clicks on advertisements from the total number of clicks billed to advertisers. In seeking class certification of their breach of contract claim, they argued that all putative class members were subject to a "uniform" advertising contract requiring that only "legitimate" or "valid"[1] clicks be charged.

After extensive discovery, followed by evidentiary submissions, briefing, and argument, the district court denied class certification. The court found that common questions did not predominate and that a class action was not a superior method of resolving the controversy for purposes of Federal Rule of Civil Procedure 23(b)(3) because Plaintiffs had not shown that the alleged obligation upon which their claim rested—the claimed commitment to bill only for "valid" clicks—was the subject of a uniform, classwide contract, and also had not offered a

---

[1] Plaintiffs and their experts use the terms "legitimate" and "valid" synonymously. For convenience, Facebook will use the term "valid" (and "invalid"), except where quoted record material uses "legitimate."

workable classwide method for determining liability and damages.  The court
further found that Plaintiffs were not adequate class representatives under Rule
23(b)(4) because, among other reasons, they were subject to unique defenses.

Plaintiffs challenge these conclusions, but do not demonstrate that the
district court abused its discretion in denying class certification.  Courts frequently
deny class certification in breach of contract cases where the plaintiff fails to
demonstrate the existence of a uniform contract.  Here, the district court correctly
held that Plaintiffs' theory of a classwide contract regarding "valid" clicks relied
on extra-contractual materials that would require individualized inquiries into the
knowledge of myriad class members.  Although Plaintiffs claim that the district
court improperly ruled on the "merits" of their contract claims, the court did
exactly what it was required to do by Rule 23 and by binding case precedent—
namely, consider merits-related issues to the extent that they bear upon the
existence of common questions under Rule 23.  *See Amgen Inc. v. Conn. Ret. Plans
& Trust Funds*, ___ U.S. ___, No. 11-0085, slip op. at 9 (2013), 2013 WL 691001.
As the court properly found, Plaintiffs' failure to make good on their claim of a
"uniform" contract meant that common issues did not predominate and that the
class mechanism was not a superior means of resolving the dispute.

Even if Plaintiffs could show that there was a uniform, classwide contract
requiring Facebook to bill only for "valid" clicks, the district court's alternative

holdings independently require affirmance. Specifically, the district court found that individualized issues of liability and damages still would predominate, given Plaintiffs' inability to provide a workable method for distinguishing between "invalid" clicks (the subject of their claims), "valid" clicks (for which Plaintiffs concede they may be charged), and "fraudulent" clicks (which Plaintiffs acknowledge are not part of the case in light of the district court's ruling on the motion to dismiss). ███████████████████████████

████████████████████████████████████████████████

████████████████████████ (ER 1389, 1557-1558, 767.)[2] ████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████ Moreover, the industry guidelines that Plaintiffs contend would assist in identifying "valid" clicks confirm that the inquiry would require gathering individualized data from each advertiser for comparison

---

[2] "ER" and "SER" refer to Appellants' Excerpts of Record and Facebook's Supplemental Excerpts of Record, respectively. "AOB" refers to Appellants' Opening Brief. "CR" refers to the clerk's record in the district court, and is followed by the docket control number.

against Facebook's logs. Given this record, Plaintiffs cannot show that the district court abused its discretion.

Finally, the district court acted within its discretion when it found that Plaintiffs failed to carry their burden of showing that they would adequately represent the class, another alternative basis for denying certification. The named Plaintiffs are subject to unique defenses—including the failure to comply with a contract term requiring submission of any payment disputes within 30 days of the disputed charge—and have different interests from those of other putative class members in numerous other respects. Additionally, one of the Plaintiffs was unfamiliar with basic aspects of the case and indicated that he would defer to his counsel on critical decisions.

Lacking any basis for claiming an abuse of discretion, Plaintiffs have loaded their opening brief with extraneous and inaccurate factual statements about Facebook's practices for determining when to bill advertisers—a strategy transparently designed to paint Facebook in a bad light. (AOB 8-13.) ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ This robust

record belies Plaintiffs' efforts to distract the Court with incorrect and irrelevant

accusations about Facebook's administration of its "cost-per-click" advertising program. And Plaintiffs' assertions cannot substitute for the factual showing necessary to carry Plaintiffs' burden under Rule 23. The district court's order denying class certification should be affirmed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1332(d). The court entered its order denying Plaintiffs' motion for class certification on April 13, 2012. On April 27, 2012, Plaintiffs filed their petition for permission to appeal in this Court pursuant to Federal Rule of Civil Procedure 23(f), and this Court granted the petition on July 17, 2012. This Court has jurisdiction pursuant to 28 U.S.C. § 1292(e) and Rule 23(f).

## STATEMENT OF THE ISSUES

A.      Whether the district court abused its discretion in holding that Plaintiffs failed to satisfy the predominance and superiority requirements of Rule 23(b)(3) due to the need to determine issues of contractual interpretation, liability, and damages on an individualized basis.

B.      Whether the district court abused its discretion in holding that Plaintiffs were not adequate class representatives under Rule 23(a)(4).

## STATEMENT OF THE CASE AND OF THE FACTS

**I.    Facebook And Its Advertising Practices**

**A.    Facebook's Services**

Facebook owns and operates a well-known social networking website, with over a billion registered users.  Facebook has provided advertising services to more than 100,000 persons or entities during the proposed class period, which began in May 2009 (ER 10).  A wide variety of entities advertise on Facebook, including individuals and small corporations, *see infra* pp. 13-14, and large corporations such as ███████████████████████████████ (SER 11.)

**B.    Facebook's Advertising Channels**

Facebook offers multiple channels for advertisers.  "Direct Advertisers" work directly with Facebook representatives to help manage advertising campaigns.  (ER 83-84.)  Contracts with Direct Advertisers can take several forms.  These include contracts using Facebook's form template, as well as individually negotiated agreements that incorporate the Direct Advertiser's standard terms or otherwise reflect direct negotiations between Facebook and the advertiser.  (ER 84; *see also* ER 116-123.)

Other advertisers retain third-party agencies that run Facebook advertising campaigns on their behalf.  Many of these "Third Party Advertisers" do not communicate with Facebook at all, but rely on the expertise of their agent.

Sometimes, a single agency manages multiple advertiser accounts under a single account with Facebook.  (ER 84-85.)

Still other "Self Service Advertisers"—such as the named Plaintiffs here—contract with Facebook through a publicly available, web-based tool.  (ER 80.) This tool allows Self Service Advertisers to set up an advertising account, design their ads, identify their target audience among registered Facebook users, and select how much they are willing to pay for the advertising services.  (ER 80-81.)

After a Self Service Advertiser designs its advertising campaign using Facebook's tool, it executes a "click-through" contract with Facebook by clicking a button on a "Place Order" webpage.  (ER 2, 81.)  Adjacent to this button is the following statement:

> By clicking the "Place Order" button, I agree to the Facebook Statement of Rights and Responsibilities including my obligation to comply with the Facebook Advertising Guidelines.  I understand that failure to comply with the Terms and Conditions and the Advertising Guidelines may result in a variety of consequences, including the cancellation of any advertisements I have placed, and termination of my account.

(ER 81; *see also* ER 364 (screen shot of earlier version of "Place Order" webpage).)  The "Place Order" webpage contains hyperlinks through which a Self Service Advertiser may access the "Statement of Rights and Responsibilities" ("SRR") and the "Facebook Advertising Guidelines."  (ER 3.)

The SRR states that "[w]e [Facebook] cannot control how people interact with your ads, and are not responsible for click fraud or other improper actions that affect the cost of running ads," and that "[t]he amount you owe will be calculated based on our tracking mechanisms." (ER 82.) The SRR also incorporates and links to Facebook's standard Payment Terms (ER 94, 96, 99-100), which, throughout the proposed class period, included a provision stating: "To the fullest extent permitted by law, you waive all claims against us related to payments unless you submit the claim to us within 30 days after the charge."[3] (ER 83, 114.) Finally, the SRR contains an express integration clause providing that it "makes up the entire agreement between the parties regarding Facebook, and supersedes any prior agreements." (*See* ER 83, 97, 110.)

## C. Facebook's "Click" Systems

Among the options offered to all advertisers is whether to pay for ads on a "cost-per-click" basis (*i.e.*, to pay a charge for each time a Facebook user clicks on an ad), or a "cost-per-thousand-impressions" basis (*i.e.*, to pay based on the number of times the ad is displayed on a Facebook web page, regardless of whether a user clicks on it). (ER 81.) Plaintiffs' proposed class includes all

---

[3] Plaintiffs argue that this waiver provision was not in place until July 2011 (AOB 43), but that is contrary to the record evidence. *See infra* pp. 49-50 & n.21.

advertisers that purchased "cost-per-click" ads, whether Direct Advertisers, Self Service Advertisers, or Third Party Advertisers.

Facebook has implemented systems to determine how "clicks" are calculated for purposes of assessing advertising charges. For example, ███████

████████████████████████████████████████████████████

████████████████████ (SER 1-2)—████████████████████

████████████████████████████████████ (SER 2).

Facebook also has developed a series of "click filters" designed to exclude certain types of clicks from the click totals charged to cost-per-click advertisers. (SER 2.)

████████████████████████████████████████

████████████████████ (SER 2-3.) ████████████████████

████████████████████████████████ (ER 1481-1483),

████████████████████████████████ (ER 1480).

████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

(SER 2-3.) ████████████████████████████████████

████████████████████████████████████████

████████████████████████████ (SER 3.) ████████████████████



(ER 1482)—

(SER 3).[4]

(SER 4.)

(SER 4.)

Details about Facebook's click filters are not incorporated into or identified in any of its advertising contracts.  Indeed, Facebook does not disclose the algorithms and other technical information comprising its click filters to the public or its advertisers.  (ER 397.)

(ER 828.)

---

[4] Facebook's click filters are too numerous to be described exhaustively here; Facebook has produced over 4,000 pages of internal Facebook documents relating to the precise technical details of its systems.  (ER 69.)

### D.     Information Available to Facebook Advertisers

Although the technical details of Facebook's click methodologies are non-public, Facebook employs representatives to address questions or concerns raised by advertisers.  Direct Advertisers generally are assigned to a customer service representative, with whom they can raise questions regarding click-related matters.  (ER 83-84.) ████████████████████████████████████████ ███████████████████████████████ (SER 4-5.)  Facebook also provides information and answers to frequently asked questions on its "Help Center" webpage.  (ER 393-431.)  This webpage is not part of any contract between Facebook and any advertiser.  Among the thousands of entries in the Help Center is a "Glossary of Ad Terms," which offers background and information on dozens of different advertising terms, including the term "Click."  The Glossary of Ad Terms states, for example, that Facebook has "a variety of measures in place to ensure that we only report and charge advertisers for legitimate clicks," and explains that Facebook is unable to provide specific information regarding its click filters because of the proprietary nature of its technology.  (ER 397.)  It is on this language from the Glossary that Plaintiffs primarily rely for their claim that Facebook has a "uniform contract" regarding "valid" and "invalid" clicks.

### E.    IAB Guidelines

Plaintiffs' Rule 23 arguments also rely on guidelines first issued in May 2009 (the beginning of the proposed class period) by the Interactive Advertising Bureau (IAB), a trade association for media and technology companies.  *See* About the IAB, http://www.iab.net/about_the_iab (last visited Mar. 3, 2013).  The IAB's "Click Measurement Guidelines" offer broad "recommendations" on policies regarding the counting of "clicks."  (ER 313.)  Plaintiffs do not contend that they were expressly incorporated or even referenced by any of Facebook's advertising contracts, █████████████████████████████████ (ER 1151).

The IAB guidelines operate at a high level of generality.  For example, they recommend that click-measurement policies should consider whether "[t]he time between the ad impression"—that is, when the advertisement first appears on a user's screen—"and the Click is less than an amount called the impression-staleness-window."  (ER 318.)  The guidelines do not say anything about how long this "impression-staleness-window" should be, nor are there any industry standards on this subject.  (ER 318; ER 1518-1519 (testimony of Plaintiffs' expert).)

Although the IAB "encourage[s]" third-party auditing and certification of click-measurement policies (ER 328-329), a relatively small number of Internet companies have received IAB certification for click measurement.  None of the major social networking websites—including LinkedIn, Twitter, and Facebook—

has been certified.  (*See* ER 1618 n.28; http://www.iab.net/guidelines/1290962 (last visited Mar. 3, 2013).)  Nevertheless, ███████████████████████████ ████████████████████████████ (ER 756-757), ███████████████████ ███████████████████████████████████████████  For example, the IAB suggests that publishers establish, to the extent possible, "a Maximum Level of Clicks per User ... on a given ad creative within a fixed time period."[5]  (ER 319.)  As Plaintiffs acknowledge, ████████████████████ ████████████████████████████████████████████████████ ████████  (AOB 12-13.)

## II.    Named Plaintiffs

### A.    Fox Test Prep

Plaintiff Fox Test Prep is a sole proprietorship, operated by Nathan Fox (collectively, "Fox"), that offers preparation courses for standardized tests.  (ER 586, 598.)  For approximately seven months in 2009, Fox contracted with Facebook through the Self-Service tool for the placement of cost-per-click advertisements.  (ER 598.)  Facebook allegedly charged Fox just over $1,000 for approximately 1,000 clicks during that period.  (ER 599.)  Fox testified that he hired a third party to set up software that tracked visits to his website.  (ER 225-

---

[5] The IAB Guidelines offer no details on what that "fixed time period" should be. (*See* ER 1521.)

226.)  He said he decided to bring this suit after reviewing reports generated by that software, because "it looked like a bad deal to me."  (ER 214.)

### B.     Stephen Price

Plaintiff Stephen Price ("Price") owned and operated a website called "www.drivedownprices.com," which was intended to facilitate the sale and purchase of automobiles.  (ER 236-237.)  The website was launched in 2009 and ceased operations in 2010; no customer ever consummated an actual transaction on the site.  (ER 239-240, 251-253.)  Price was a Self Service Advertiser with Facebook during part of 2009.  (ER 239-240, 251.)  He alleges that he was charged approximately $500 by Facebook for advertisements.  (ER 597.)

### III.   Proceedings Below

### A.     Plaintiffs' Complaint

Plaintiffs filed this putative class action in 2009.  (CR No. 1.)[6]  They assert claims for breach of contract; violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL"); and declaratory relief.  (ER 602-607.)  Their theory is that Facebook allegedly charged Plaintiffs "for a panoply of 'invalid clicks' resulting from deficiencies in Facebook's advertising platform."  (ER 582.)

---

[6] The operative complaint was filed on September 24, 2010.  (ER 581.)

The district court dismissed certain aspects of Plaintiffs' First Amended Complaint on August 25, 2010.  (ER 610.)  The court held that Plaintiffs' breach of contract and UCL claims based on "click fraud"—or, "clicks that were made in a deliberate effort to drive up the cost of an ad or deplete an advertiser's budget"— could not proceed, because of the express disclaimer in the SRR precluding liability for "click fraud."  (ER 613, 615, 621; *see also* ER 82.)  The district court did not dismiss Plaintiffs' claims "for third-party clicks that are neither fraudulent nor improper yet still invalid," so it is those claims that currently are at issue.  (ER 618.)

## B.     The District Court's Denial of Class Certification

Plaintiffs filed their motion for class certification on September 2, 2011. The proposed class includes "[a]ll persons and/or entities in the United States who paid money to Facebook, Inc. for cost-per-click advertising during the period of May 2009 to the present."  (CR No. 205 at i.)

The parties engaged in months of class certification discovery, and submitted more than 90 exhibits, five expert reports, and over 450 pages of deposition testimony.  The court held a nearly two-hour hearing on the motion on March 7, 2012.

On April 13, 2012, the district court issued a 24-page order in which it declined to certify the class on two separate grounds.  (ER 1-24.)  Initially, the

court concluded that Plaintiffs had failed to establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The district court identified three separate areas in which individualized determinations would be required.

*First*, the district court considered and rejected Plaintiffs' theory that common questions predominated because their breach of contract claim arises from a "uniform advertising contract" governing the type of clicks for which pay-per-click advertisers may be charged. (CR No. 205 at 1; *see* ER 18.) To assess this argument, the court examined whether such a "uniform" contract actually existed. Plaintiffs asserted that the purported obligation for Facebook to charge only for "valid" clicks was created by a combination of (among other documents) Facebook's SRR and Advertising Guidelines, and language in the Glossary of Ad Terms, located in Facebook's Help Center. The court found that this theory would create individual issues, because the language in the Glossary could not affect the meaning of Facebook's tens of thousands of contracts with its advertisers on a uniform basis. The court found that it was "not clear how [the Glossary] can reasonably be considered part of a 'uniform written contract,'" because the Glossary language was not incorporated into the terms of the contracts—*i.e.*, it was

not "referenced in or linked to the" Place Order page or the SRR—and the SRR contained an integration clause precluding incorporation of extra-contractual commitments. (ER 15-16.)

The district court also rejected Plaintiffs' argument that the Glossary definition could be viewed as extrinsic evidence creating a classwide contract. Even if the Glossary could be viewed as extrinsic evidence, the court reasoned, it would not affect the meaning of the contract on a uniform, classwide basis because "many members of the proposed class would never have reviewed the material" in the Glossary, and thus the court would need to engage in individualized inquiries to determine which class members were aware of the Glossary definition. For example, some Self Service Advertisers might have read the Glossary if they navigated to the Help Center and clicked on the particular pages; but "Direct Advertisers who contracted directly with Facebook would have had no reason to consult the Help Center"; and advertisers who placed their advertisements through third-party agencies were "even less likely to have consulted the Help Center." (ER 17.) Because the Glossary terms did not give rise to a uniform contract, they did not create common issues that predominated over individualized ones.

*Second*, the district court found that Plaintiffs had failed to establish a workable method of distinguishing between "valid" and "invalid" clicks that would allow a classwide liability determination. (ER 18-19.) The court also noted that

Plaintiffs had not established a viable methodology for excluding "fraudulent clicks," which were not at issue in light of the court's prior dismissal order. (ER 18.) After surveying the expert evidence from both sides, the court concluded that "plaintiffs have no classwide method to parse the millions of clicks in this case to segregate the 'invalid' clicks." (ER 19.)

*Third*, and relatedly, the district court held that "the calculation of damages will require an individualized inquiry." (ER 19-20.) This was particularly so, the court noted, because Plaintiffs' own expert conceded in his deposition that Plaintiffs' proposed methodology for determining damages "would invariably lead to 'false positives' in which damages could be awarded for 'valid' clicks from real users." (ER 19.)[7]

In addition to holding that common issues did not predominate and that the class action was not a superior means of resolution under Rule 23(b)(3), the district court held that Plaintiffs failed to establish that they would "fairly and adequately protect the interests of the class" as required by Rule 23(a)(4). The court reasoned that both Fox and Price stand in a markedly different position from other class members, because they might be required to litigate individualized defenses that

---

[7] The district court's Rule 23(b)(3) inquiry with respect to Plaintiffs' UCL claims mirrored the analysis described above, because Plaintiffs' theory of liability under the UCL was premised on allegations of "'a 'systematic' breach of contract." (ER 20; *see id.* ER 20-23.)

- 18 -

could be dispositive of their claims, including the defense that they waited too long to assert their claims. (ER 10.) The court also noted that Price and Fox had interests different from those of other class members, because, for example, Price and Fox were Self Service Advertisers and other class members were Third Party or Direct Advertisers. (*Ibid.*) Finally, the court cited Fox's deposition testimony "that he knows essentially nothing about the case" and "would defer to counsel in prosecuting the action." (ER 10-11.)[8]

## SUMMARY OF ARGUMENT

1.     The district court acted within its discretion in holding that Plaintiffs failed to satisfy the predominance requirement of Rule 23(b)(3).

a.     Plaintiffs failed to establish a uniform, classwide contract governing "invalid" clicks. They argue that the meaning of "clicks" must be informed by extrinsic evidence from a definition in the online Glossary, found in the Help Center. But, as the district court recognized, this definition cannot serve as extrinsic evidence on a classwide, uniform basis, because it is likely that many class members did not review it. The court therefore would need to engage in individualized inquiries to determine whether the language was read and understood by specific class members. It was appropriate for the district court to

_____

[8] The court separately found that Plaintiffs had satisfied the requirements of Rule 23(a)(1), (2), and (3). (ER 6-9.)

consider these issues because, although they touch upon the merits, they overlap with the requirements of Rule 23.

       b.      Plaintiffs also failed to establish a classwide methodology for determining liability. Even assuming Facebook's contracts uniformly bound it to charge only for "valid" clicks, Plaintiffs' expert could not articulate any specific methodology for determining whether and to what extent Facebook breached this obligation with respect to particular class members. He merely speculated in vague terms that it was theoretically possible to make such a calculation.

    2.      The district court's holding that Plaintiffs were not adequate class representatives under Rule 23(a)(4) also was within its significant discretion, and presents an independent ground for affirmance.

       a.      Both Price and Fox are subject to unique defenses—a factor that weighs strongly against a finding of adequacy. In particular, neither Plaintiff established that he disputed any charges prior to the 30-day contractual deadline, and neither Plaintiff has attempted to show any specific injury from charges for a specific "invalid" click.

       b.      Both Price and Fox have unique interests that do not align with those of other class members. Among other things, they both are small, low-budget, Self Service Advertisers that have ceased all advertising on Facebook,

whereas some putative class members are large, sophisticated Direct Advertisers that continue to advertise on Facebook.

       c.      Finally, Fox lacked any meaningful knowledge about the case, and testified that he intends to defer entirely to his counsel on critical issues in the case.

## STANDARD OF REVIEW

"Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (same). "The party seeking class certification has the burden of affirmatively demonstrating" that the proposed class satisfies Rule 23. *Mazza*, 666 F.3d at 588; *see also Dukes*, 131 S. Ct. at 2551 (same).

Under Rule 23(a), plaintiffs seeking class certification must show that (1) "the class is so numerous that joinder of all members is impracticable," (2) there are "questions of law or fact common to the class," (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class," and (4) the named plaintiffs "will fairly and adequately protect the interests of the class." Plaintiffs also must satisfy one of the three requirements in Rule 23(b). Plaintiffs here rely exclusively on Rule 23(b)(3), which permits class

certification where, in addition to the above requirements, the district court finds

that "questions of law or fact common to class members predominate over any

questions affecting only individual members," and that a class action would be

"superior to other available methods for fairly and efficiently adjudicating the

controversy." Under Rule 23, a plaintiff must produce *evidence* meeting each

required element of the Rule; merely pointing to the pleadings is insufficient.

*Dukes*, 131 S. Ct. at 2551.

This Court reviews the district court's decision regarding class certification

for abuse of discretion. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th

Cir. 2011).

## ARGUMENT

### I. The District Court Acted Well Within Its Discretion In Holding That Common Issues Do Not Predominate And That A Class Action Is Not Superior

The district court acted well within its discretion in concluding that Plaintiffs

failed to show a predominance of common issues or the superiority of a class

action under Rule 23(b)(3). As the court found, Plaintiffs' argument that all

putative class members are subject to a uniform contract governing "invalid" clicks

was not borne out by the actual contracts, which do not contain the "uniform"

provision on which Plaintiffs purport to rest their classwide claims. And even if

Plaintiffs could show a classwide commitment to filter clicks in a particular way,

they have not established any workable methodology for determining on a classwide basis whether Facebook breached that obligation or whether particular class members were harmed by the alleged breach.

### A. Plaintiffs Failed to Carry Their Burden of Establishing That Common Contract Questions Predominate

Plaintiffs bear "the burden of affirmatively demonstrating" that common questions predominate over individual questions. *Mazza*, 666 F.3d at 588. They sought to carry this burden by demonstrating the existence of a single advertising contract that is "materially uniform as to all members of the class" and that requires Facebook to "charge advertisers for only valid clicks." (AOB 22, 31-32.) Before the district court, Plaintiffs advanced two legal theories for such a uniform contract creating common questions: (1) that the definition of "Clicks" in the Glossary of Ad Terms was itself "incorporated into the uniform contract"; and, alternatively, (2) that the Glossary definition was "[r]elevant extrinsic evidence" shedding "light … on the intended meaning of contract terms like 'click.'" (CR No. 205 at 6, 26.) The district court considered both theories and concluded that Plaintiff had failed to show a "uniform" contract and thus had failed to carry their Rule 23 burden of establishing that their contract claim is amenable to classwide treatment. (ER 18.) That conclusion complied with the requirement of Rule 23(b)(3) and California law.

### 1. Plaintiffs did not establish a uniform contract

Plaintiffs failed to support their theory that common questions arose from a single uniform contract that, by its terms, provides that "advertisers will be charged for only legitimate clicks."  (CR No. 205 at 1 (quotation mark and alteration omitted).)

Federal courts repeatedly have found class certification inappropriate for a breach of contract claim where the named plaintiff fails to establish a uniform contract.  In *Martinez v. Welk Group, Inc.*, 2012 WL 2888536, at *4 (S.D. Cal. July 13, 2012), for example, the plaintiff argued that common questions predominated because "his claims [were] based on form contracts that [were] 'essentially identical' for all purposes relevant to the claims raised."  The district court denied certification, concluding that not all members of the proposed class had the same contract, and that "individual inquiries" were necessary to determine whether the defendant breached the various contracts.  *Ibid.*  Other courts take a similar approach.  *See, e.g.*, *Bohannon v. Allstate Ins. Co.*, 847 F.2d 740, 741 (11th Cir. 1988) (vacating class certification where state law directed that the scope of class members' insurance policies "be resolved on a contract-by-contract basis"); *Hewitt v. Joyce Beverages of Wis., Inc.*, 721 F.2d 625, 628 n.2 (7th Cir. 1983) (affirming denial of certification and "find[ing] no merit to the plaintiffs' claim

that they can prove, or that they have even alleged, a uniform, oral distributorship agreement").[9]

Here, Plaintiffs do not even press on appeal their argument that the reference to "legitimate clicks" in the Glossary definition of "Clicks" in Facebook's Help Center was incorporated into Facebook's advertising contracts, thereby creating a uniform contract presenting common issues under Rule 23. In rejecting this argument below, the district court found that the click-through contract for Self Service Advertisers could not possibly incorporate this Glossary definition because the contract contains an express integration clause and does not reference or link to the Glossary. (ER 15-16.)[10] And at no point have Plaintiffs adduced evidence that

---

[9] State courts have applied their Rule 23 analogs in consistent fashion. In *Avery v. State Farm Mutual Automobile Insurance Co.*, the plaintiffs sought class certification on the theory that the defendant had a uniform insurance policy. 216 Ill. 2d 100, 113 (2005). The Illinois Supreme Court reversed the trial court's certification of a class for failure to determine the existence of a uniform contract, holding that "[i]f there were significant differences in the operative contractual language of the various policies, the commonality and predominance requirement ... could not be met, and the class could not be certified." *Id.* at 127-28. *See also Cutler v. Wal-Mart Stores, Inc.*, 175 Md. App. 177, 193 (2007) (affirming denial of class certification based on finding that "no implied contract common to the class existed," and concluding that "the possible existence of thousands of implied contracts, one for each member of the proposed class, warranted a finding that individual issues predominated").

[10] *See generally Shaw v. Regents of the Univ. of Cal.*, 58 Cal. App. 4th 44, 54 (1997) ("clear and unequivocal" reference needed for incorporation); *Brawthen v. H & R Block, Inc.*, 28 Cal. App. 3d 131, 137 (1972) (parol evidence inadmissible where parties agree that the written instrument is integrated).

contracts for Direct Advertisers or Third-Party Advertisers contain any express terms governing charges for "valid" clicks.[11]

Plaintiffs' remaining argument also was properly rejected by the district court. They assert that the same Glossary definition of "Clicks" can serve as "extrinsic" evidence to create a "uniform" contract and thus establish a predominance of common issues for Rule 23 purposes. (AOB 32-34 (district court should have employed "basic tools of contract interpretation under California law" to find a uniform contract).) But, as the district court recognized, reliance on extrinsic evidence necessarily would have raised myriad individualized issues concerning whether class members reviewed the "Clicks" definition in the Glossary. (ER 17.) For this reason, although extrinsic evidence in theory could be of use in deciding an individual breach of contract claim, it generally cannot create a "uniform" contract for Rule 23 purposes.

Courts have recognized that Rule 23 certification is inappropriate in a contract action where interpretation of the relevant contracts will require resort to extrinsic evidence, necessitating individualized inquiries into whether and to what

---

[11] Plaintiffs' argument that "courts routinely find claims involving [form] contracts ideal for class treatment" (AOB 29-30) misses the point. Cases involving "interpretation of [a] form contract, executed by all class members and defendant," *e.g.*, *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 42 (1st Cir. 2003) (cited in AOB 30), are inapposite where, as here, the plaintiff has failed to establish the existence of such a uniform contract in the first place.

extent individual class members were aware of that evidence when they entered their contracts. In *Gregurek v. United of Omaha Life Insurance Co.*, 2009 WL 4723137 (C.D. Cal. Nov. 10, 2009), for example, the court granted a motion to decertify a class in a breach of contract case involving universal life insurance policies. The court found it would be necessary to interpret the contract language in the light of extrinsic evidence from individual sales terms bearing upon "what United objectively believed a policyholder's understanding of the [disputed provision] to be." *Id.* at *7. Because these individual presentations varied from customer to customer, "resolution of the [contractual] ambiguity" could "[]not be made on a class-wide basis." *Ibid.*

Similarly, in *Avritt v. Reliastar Life Insurance Co.*, 615 F.3d 1023 (8th Cir. 2010), the Eighth Circuit affirmed the denial of class certification where extrinsic evidence would be needed to give meaning to a key contractual provision. Because that evidence could include "how the contract was explained in various sales discussions" and the individualized understanding of each purchaser, the defendant's "liability to the entire class for breach of contract [could] not be established with common evidence." *Id.* at 1030. *Accord Sacred Heart Health Sys., Inc. v. Humana*, 601 F.3d 1159, 1176-77 (11th Cir. 2010) ("Even the most common of contractual questions—those arising, for example, from the alleged breach of a form contract—do not guarantee predominance if individualized

extrinsic evidence bears heavily on the interpretation of the class members' agreements.").[12]

Plaintiffs argue that the district court misunderstood California law as it applies to extrinsic evidence (AOB 33-34), but the Court's order followed settled California precedent. Extrinsic evidence may inform the meaning of a contract only if both parties were aware of it at the time of contracting; materials that "are not expressions of intent communicated between the" parties are "not relevant to the mutual intent of the parties at the time" of contracting. *Smith v. Adventist Health System/West*, 182 Cal. App. 4th 729, 755 & n.18 (2010); *see, e.g.*, *SCC Alameda Point LLC v. City of Alameda*, ___ F. Supp. 2d ___, 2012 WL 4059884, at *10 (N.D. Cal. Sept. 14, 2012) (Breyer, J.) ("[u]ndisclosed communications and understandings are not credible extrinsic evidence and may not be used by the Court to determine the parties' mutual intent").

The district court correctly concluded that the Glossary could not inform the mutual understanding of each class member's advertising contract on a uniform,

---

[12] *See also, e.g.*, *Duchardt v. Midland Nat'l Life Ins. Co.*, 265 F.R.D. 436, 448-49 (S.D. Iowa 2009) (class certification inappropriate where extrinsic evidence might require the court "to engage in individual factual inquiries into the facts surrounding the formation of ... potentially thousands of contracts"); *Adams v. Kansas City Life Ins. Co.*, 192 F.R.D. 274, 281-82 (W.D. Mo. 2000) (allowance of extrinsic evidence would make the plaintiffs' breach of contract claims "become individualized and not reasonably susceptible to class action treatment"); *Parkhill v. Minn. Mut. Life Ins. Co.*, 188 F.R.D. 332, 343 (D. Minn. 1999) (same), *aff'd*, 286 F.3d 1051 (8th Cir. 2002).

classwide basis, because it is "highly likely" that many members of the proposed class would never have reviewed the relevant Glossary pages. (ER 17.) Although some Self Service Advertisers might have navigated to the Help Center and clicked on the particular pages at issue, Plaintiffs do not dispute the district court's conclusion that Direct Advertisers—who had "direct access to a Facebook representative to answer any questions"—"would have had no reason to consult the Help Center," and Third Party Advertisers were "even less likely to have consulted the Help Center." (*Ibid.*) These factual disparities among class members preclude use of the Glossary definition of "Clicks" as extrinsic evidence on a classwide basis, because the Glossary could not possibly bear on "the mutually understood meaning" of the contracts for advertisers who never read it. *Pac. Gas & Elec. Co. v. Zuckerman*, 189 Cal. App. 3d 1113, 1141 (1987).

Plaintiffs offer the perplexing response that "whether a class member had knowledge of or reviewed the extrinsic evidence ... is irrelevant under California contract law." (AOB 35.) But the cases they cite stand only for the point that contracts should be interpreted based on "the objective intent" of the parties as shown by the words of the instrument, not a party's subjective intent. *Buckley v. Terhune*, 441 F.3d 688, 695 (9th Cir. 2006) (quoting *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 802 n.9 (1998)). That principle does not change the equally settled rule that *extrinsic* evidence may be considered as a source of meaning for

contractual terms only where actually communicated between the parties. *See supra* p. 28. As the Eighth Circuit recently explained in a case governed by analogous principles of Washington state law, this type of argument:

> improperly conflates the distinct concepts of subjective intent and extrinsic evidence. The objective manifestation theory of contracts … lays stress on the outward manifestation of assent made by each party to the other and accordingly imputes to each party an intention corresponding to the reasonable meaning of a person's words and acts. This principle establishes the standard by which evidence of intent is analyzed; it does not prevent a court from using extrinsic evidence....

*Avritt*, 615 F.3d at 1030 n.4 (internal quotation marks and citation omitted).

Plaintiffs mischaracterize two unpublished district court opinions as holding that extrinsic evidence may be used to interpret online contracts in California even if not actually reviewed by the parties. (AOB 35.) The first case, *Woods v. Google Inc.*, 2011 WL 3501403 (N.D. Cal. Aug. 10, 2011), does not mention "extrinsic evidence," but simply holds that a policy statement in Google's online "AdWords Help Center" was not incorporated into the terms of Google's advertising contract. The second case, *Rodman v. Safeway, Inc.*, 2011 WL 5241113 (N.D. Cal. Nov. 1, 2011), held only that the plaintiff had stated a claim for breach of an online contract with Safeway for grocery deliveries. The court considered "extrinsic evidence" from the Frequently Asked Questions section of the online ordering system, which stated that customers would "be charged the prices charged in the

store." *Id.* at *3. The court did not discuss or cite California authority on extrinsic evidence, nor did it have occasion to consider whether extrinsic evidence was competent when a contracting party was not aware of it: the court was not deciding a class certification motion, and the named plaintiff had averred in his complaint that he "understood that he would be charged the same price for groceries as the in-store price." Complaint ¶ 25, *Rodman v. Safeway, Inc.*, No. 11-03003 (N.D. Cal. June 17, 2011) (Dkt. No. 1).

Together with their arguments based on extrinsic evidence, Plaintiffs argue that "trade usage" creates a common contractual obligation regarding "valid" clicks. (AOB 34.) But this theory also would inject individualized issues into the case. California law allows trade usage evidence where "both parties are engaged in that trade" and "an established usage is known to the parties to a transaction." *Hayter Trucking, Inc. v. Shell W. E&P, Inc.*, 18 Cal. App. 4th 1, 15, 16 (1993). Even if there were an "established usage" of the term "click" in the trade of Internet advertising—which Plaintiffs have not established—the court still would need to consider whether such usage was "known" to each individual class member. *Id.* at 16. The answer surely would vary across this enormous class of advertisers, which is broadly defined to include both sophisticated corporations and individuals who purchase only a few dollars worth of advertisements on a one-off basis. *See, e.g.*, *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091,

1107 n.10 (10th Cir. 2005) (class certification would be unlikely for a class of approximately 10,000 royalty owners due to individualized issues concerning "relevant usage of trade," among other things).

Here, even the two named Plaintiffs have conflicting views as to what Facebook promised them regarding billing for clicks. As the district court explained after reviewing their deposition testimony,

> [w]hile both allegedly reviewed the Help Center material, they came to different conclusions with respect to "invalid" clicks. Price testified in his deposition that he understood an "invalid" click to be one that did not reach to his landing page or website, and that he expected that Facebook would bill for all clicks that reached the website—including clicks from automated non-human sources. This is contrary to plaintiffs' allegation … that clicks from "a computer 'bot' and not a human" are "invalid" clicks.
>
> For his part, Fox testified in his deposition that he had no specific understanding of what clicks would be billed, and that while he claimed to have reviewed the Help Center material, the only expectation he formed as a result was that Facebook would employ "some systems" in place to address "invalid" clicks.

(ER 17; *see also* ER 218-222, 241-243 (Plaintiffs' deposition transcripts).)

Nor do Plaintiffs' arguments regarding the implied covenant of good faith and fair dealing create a predominance of common questions for Rule 23 purposes. The covenant does not obviate an analysis of each putative class member's contract with Facebook because it "does not exist independent of an express

contractual obligation, but *must be appurtenant to express contractual duties*."
*Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1766, 1771 (1994) (emphasis added); *see Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1031 (1992) ("The implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation.").  The covenant merely prevents one party from "unfairly frustrating the other party's right to receive the benefits of the agreement actually made," but it "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement."  *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349-50 (2000).  Plaintiffs thus cannot conjure a uniform contract by relying on the implied covenant, which may only apply *after* a court has resolved what contractual provisions are contained in each individual contract.

Finally, not only is there no contract containing a "uniform" provision regarding the meaning of "click," but because of the multiple channels that Facebook offers to advertisers, *see supra* pp. 6-8, Facebook has many different contracts with the putative class members that differ substantially in form and substance.  For example, Direct Advertisers are not subject to the online, click-through contract described above.  Direct Advertisers instead work directly with Facebook's representatives, and enter into different types of contracts, including some with unique terms and others based on a Facebook template called the

"Direct Terms." (ER 83-84, 117.) The "Direct Terms" materially differ from the SRR that binds Self Service Advertisers. (ER 84.) Most significantly, for contracts entered after July 2010, the Direct Terms include an express disclaimer of liability with respect to "invalid" clicks, which states that:

> FACEBOOK SHALL HAVE NO LIABILITY FOR
> CLICK FRAUD OR OTHER IMPROPER ACTIONS,
> OR FOR INVALID CLICKS OR OTHER
> TECHNOLOGICAL ISSUES, EACH OF WHICH MAY
> AFFECT THE COST OF ADVERTISING.

(ER 84, 122.) Plaintiffs do not address the unique contracts applicable to Direct Advertisers, or explain how their breach of contract claim based on charges for "invalid" clicks could involve common questions when the contracts of many putative class members explicitly state that Facebook has no liability for such claims. Although the district court did not directly address this point, it further supports affirmance.[13]

### 2. The district court did not err by considering merits issues that overlapped with the Rule 23 inquiry

Plaintiffs contend that the district court abused its discretion by "prematurely" considering issues of contractual interpretation and arriving at a "decision on the ultimate merits" of the suit. (AOB 25, 22.) That argument

---

[13] It was not necessary for the district court to discuss these unique characteristics of Facebook's contracts with Direct Advertisers due to its other bases for finding that Plaintiffs' contract claims would create individualized issues. Nevertheless, this Court may consider these matters as a basis for affirmance. *See Sussman v. Am. Broad. Cos., Inc.*, 186 F.3d 1200, 1203 (9th Cir. 1999).

- 34 -

mischaracterizes the district court's order and misstates the law governing federal class actions. Contrary to Plaintiffs' assertion, nothing in the order under review adjudicated the "ultimate merits" of Plaintiffs' claims. (AOB 22.) Moreover, it is settled that a district court considering class certification may address issues related to the merits of the plaintiffs' claims to the extent they overlap with the requirements of Rule 23, which is all the district court did here.

As to whether the district court decided "the ultimate merits" of Plaintiffs' claims, the court's order speaks for itself. The court found class certification to be inappropriate because "plaintiffs have failed to establish" the existence of a uniform contract governing "invalid" clicks (ER 14), and "because it is unclear what the contract is and no determination that it is 'uniform' can be made" (ER 18). That is precisely what was needed to assess whether "questions of law or fact common to class members predominate" and whether class treatment is superior. Fed. R. Civ. P. 23(b)(3). Nowhere did the court determine whether "plaintiffs have stated a cause of action or will prevail on the merits" of their individual claims, or "conclu[de] that Plaintiffs had not ... proved the elements of their claims." (AOB 26, 27.) Rather, the court considered merits questions "to the extent—but only to the extent—that they [were] relevant to determining whether the Rule 23 prerequisites for class certification [were] satisfied." *Amgen*, slip op. at 9.

It was entirely proper for the court to touch upon issues related to the merits in deciding whether common questions predominated and whether the class action method was superior. Plaintiffs themselves predicated their Rule 23 showing—on which they bear the burden of proof—on the argument that the Glossary informed the meaning of Facebook's contracts with all putative class members, thus creating a "uniform contract" that renders the suit "ideal[] for class treatment." (*E.g.*, AOB 1, 30.) Plaintiffs thus cannot complain that the court addressed that argument in deciding whether Plaintiffs had satisfied Rule 23. *See Amgen*, slip op. at 9.

In evaluating whether there is a "uniform" contract creating common questions, a court must assess whether the facts and governing principles of contract interpretation actually permit the plaintiffs' "uniform contract" theory—as the court did here in looking to whether Plaintiffs' resort to extrinsic evidence could create a classwide contract. As courts have recognized, "[i]n many cases," a district court's class-certification analysis "will entail some overlap with the merits of the plaintiff's underlying claim," *Ellis*, 657 F.3d at 980 (quoting *Dukes*, 131 S. Ct. at 2551), because "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) (internal quotation marks omitted). Such overlap frequently occurs where, as here, the question is the existence of common issues within the class. *See Ellis*, 657 F.3d at

- 36 -

980; *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011). In such contexts, it is entirely appropriate for courts to inquire into the existence of a uniform contract in determining whether a plaintiff has carried its Rule 23 burden. *See, e.g.*, *Martinez*, 2012 WL 2888536, at *4; *Bohannon*, 847 F.2d at 741; *Hewitt*, 721 F.2d at 628 n.2. Such an inquiry need not resolve a plaintiff's own individual breach of contract claims, which could be based on that plaintiff's own proof regarding the terms and meaning of his contract.

Indeed, it would defeat the purposes of Rule 23 for a district court *not* to address the existence of a uniform contract at the class certification stage. "[T]he efficiency and economy of litigation ... is a principal purpose of the [class action] procedure." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974). Class actions based upon an allegedly uniform contract will achieve those efficiencies only if the contract is actually uniform—a question that cannot be left to the time of trial. In fact, a district court would create a grave threat of *inefficiency* if it certified a class based merely on the plaintiff's unexamined assertion that the class members' claims involved a uniform contract. As the class action approached trial, the court inevitably would need to determine whether the contract was actually uniform. A determination adverse to the plaintiff at that late hour would inject a myriad of individualized issues into the certified class action, likely triggering decertification and rendering unnecessary months or even years of costly

and time-consuming litigation following the initial decision to certify the class.
*See Avery*, 216 Ill. 2d at 127-28 (trial court "was incorrect in concluding, in the
first instance, that the question of uniform contractual interpretation should be
decided at trial rather than at the class certification stage" because "had the court
answered the question in the negative rather than the affirmative, the class could
not have been certified").

**B.** **The District Court Acted Within Its Discretion in Finding That Plaintiffs Failed to Establish a Classwide Methodology for Determining Liability and Damages**

Even if Plaintiffs could show that there was a classwide contract that should
be uniformly interpreted with reference to the Help Center Glossary's definition of
"Clicks," the district court's alternative grounds for denying certification still
would require affirmance. The district court acted within its discretion in finding
that Plaintiffs failed to establish a viable classwide method for determining liability
and damages, and thus failed to carry their "burden of affirmatively
demonstrating" that these matters "can be resolved for all members of the class in a
single adjudication." *Mazza*, 666 F.3d at 589 (quotation mark omitted).

**1.** **Plaintiffs did not carry their burden of demonstrating a workable methodology**

Plaintiffs' claims center on the theory that they were improperly charged for
"invalid" clicks, as distinguished from both "valid" or "legitimate" clicks, for
which they admit they can be charged, and "fraudulent" clicks, which the district

court already held are not actionable. Given the centrality of these distinctions to Plaintiffs' claims, they needed to establish a workable methodology for defining with precision the types of clicks that qualify as "invalid," and determining on a classwide basis whether, and to what extent, putative class members were charged for such clicks. Yet Plaintiffs failed to make any such showing, on multiple levels.

*First*, Plaintiffs offered no concrete definition of what constitutes an "invalid" click for which Facebook would be prohibited from charging under Plaintiffs' theory of their contracts. They pointed to nothing in any contractual language containing such a definition (*see* AOB 32), and their resort to supposed "trade usage" yielded no workable definition or standard. On the latter point, they relied on the report of their proffered expert, Dr. Markus Jakobsson, ███████

███████████████████████████████████

███████████████████████████ (ER 767), ███

███████████████████████████████████

███████████████████████████████████

██████████ (ER 1518-1519, 1521, 1524-1525; *see* ER 18.) ███████

███████████████████████████████████

█████████████████████ (ER 1519, 1522-1523, 1525; *see* ER 18.)

- 39 -

*Second*, Plaintiffs presented no specific methodology for parsing the data—consisting of millions upon millions of clicks, for more than 100,000 putative class members—in a way that separates out the supposedly "invalid" clicks at issue in Plaintiffs' claims from "valid" clicks and "fraudulent" clicks for which Plaintiffs concede Facebook is not liable.  (ER 18-19.)  The district court acted within its discretion when it held that Plaintiffs failed to carry their burden on this point.  Jakobsson's report was conclusory and speculative, and did not set forth a specific methodology.  ██████████████████████████████████████████████████ ██████████████████████████████████████████  (ER 767 (emphasis added)), ████████████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████ [14] (*see* ER 767-770)—██████████ ████████████████████████████████████████████████ ██████████████████████████████████████

_____

[14] ██████████████████████████████████████████████ (AOB 12-13.) ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ (ER 1516-1517.)

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

(ER 1550-1552.) He admitted that ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████ (ER

1558, 1561.)[15] Rule 23(b)(3) demands of Plaintiffs far more than this "Trust me, I

know what I'm doing" approach. *See, e.g.*, *In re GPU Antitrust Litig.*, 253 F.R.D.

478, 505-06 (N.D. Cal. 2008) (denying certification motion that depended on

"promises" by plaintiffs' experts that "that they will be able to formulate the

appropriate analysis and prove both impact and damage once they obtain the

necessary data"; "plaintiffs should be able to provide more than promises at this

late stage of the litigation"); *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 70 (4th

---

[15] After Jakobsson's deposition, and after Facebook presented this testimony to the court along with its opposition to class certification, Plaintiffs filed a "rebuttal report" ████████████████ (*See* ER 1386-1401.) This new report was improper because it was submitted for the first time on reply. (Facebook objected to this report and requested that certain portions of it be struck (CR No. 233); the district court did not rule on Facebook's objections in its order.) ████████████████████████████ ███████████████████████████████████████████████████████ ██████████████ (ER 1389, 1387 (emphasis added).)

Cir. 1977) (district courts "should not certify the class merely on the assurance of counsel that some solution will be found" for determining damages).

*Finally*, and relatedly, because Plaintiffs did not establish any classwide methodology for sorting between "invalid," "valid," and "fraudulent" clicks, it means that they also have not proposed any way to determine whether particular members of the putative class were charged for "invalid" clicks and, if so, in what amount. As this Court recently recognized, a putative class member must suffer an injury in fact for Article III standing, and no class may be certified that contains members lacking Article III standing. *Mazza*, 666 F.3d at 594. But Plaintiffs have not established any way to determine with confidence whether every putative class member actually suffered injury. And even for those putative class members who did suffer an injury on Plaintiffs' theory, Plaintiffs have not identified a concrete methodology for determining the extent of their damages, or for rooting out "false positives." (*See* ER 19; *supra* p. 3.)

For all of these reasons, the district court was within its discretion in holding that Plaintiffs did not carry their Rule 23 burden of demonstrating a workable, classwide methodology for computing liability and damages.

### 2. Facebook's evidence further supported the court's conclusion that individualized questions predominate

In addition to the admissions of Plaintiffs' expert, the report submitted by Facebook's expert provided further support for the court's conclusion that

individualized questions predominate on the issues of liability and damages.  (ER
18-19.)  ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████  (ER 1601.)  █████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████  (ER 1585 (emphasis added).)

　　　Those idiosyncratic data would present highly individualized issues, as

illustrated by the named Plaintiffs here.  Fox has retained web-server logs that

were produced to Facebook and analyzed by its experts, along with Facebook's

corresponding click data.  ██████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████  (ER 1616);  ███████████

██████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████



(ER 1615.)

(ER 1610-1611, 1616.)

(ER 1610-1618.) These data not only establish the individualized nature of each plaintiff's claim, but illustrate that Facebook will have idiosyncratic defenses with respect to each plaintiff based on their unique server data, defenses that are potentially dispositive. Rule 23 may not be used to prevent Facebook from mounting those defenses. *See Dukes*, 131 S. Ct. at 2561.

Price, by contrast, never produced his server logs and his attorney represented that "it is doubtful that he will be able to segregate out the server log information that is specific to" Facebook. (ER 69, 130-134.) To the extent available, data from the server logs of other class members may allow Facebook to

defend against individual class members by showing that they suffered no injury at all—a right that cannot be abridged by Rule 23. *See Dukes*, 131 S. Ct. at 2561.

It was within the district court's discretion to credit Facebook's expert regarding the infeasibility of determining liability on a classwide basis. *See Ellis*, 657 F.3d at 983 (district courts must "resolve any factual disputes necessary to determine" whether the Rule 23 criteria are met); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307, 323 (3d Cir. 2008) ("Weighing conflicting expert testimony at the certification stage is not only permissible[, but] it may be integral to the rigorous analysis Rule 23 demands."); *accord In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006).[16]

### 3. Plaintiffs' remaining arguments related to liability and damages have no merit

Plaintiffs' remaining attacks on the district court's conclusions related to liability and damages are unfounded. Plaintiffs assert that the district court engaged in an improper *Daubert* analysis with respect to Jakobsson's opinions (AOB 37-38), but *Daubert* addressed the proper standard for *admissibility* of expert testimony, *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993). Here, the district court did not make an inadmissibility determination, but

---

[16] To the extent prior decisions of this Court have suggested otherwise, Facebook submits that those suggestions are no longer good law after the Supreme Court's decision in *Dukes*, 131 S. Ct. 2541. *See In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 970 (C.D. Cal. 2012).

rather took Jakobsson's opinion at face value and found it inadequate to meet Plaintiffs' burden for the reasons discussed above. (*See* ER 18-19.) There is a distinction between *Daubert*, which "requires a court to admit or exclude evidence based on its scientific reliability and relevance" but does not require an evaluation of the "persuasiveness" of the evidence, and the "'rigorous analysis' standard to be applied when analyzing commonality," where the court must "judg[e] the persuasiveness of the evidence presented." *Ellis*, 657 F.3d at 982. The latter is precisely what the district court did here.[17]

Plaintiffs next contend that the district court misunderstood the division of labor among their experts, and that a witness named Kevin Lee, and not Jakobsson, was "proffered as an expert in determining the specific contours" of the "algorithmic rules that [Dr. Jakobsson] would employ." (AOB 39 & n.8.) But this would be news to the district court, given that Plaintiffs did not so much as mention Lee or cite his report in the sections of their briefs dealing with liability and damages methodology. (*See* CR No. 205 at 17-18, 28-29; CR. No. 284 at 17-18.) And it might also be news to Mr. Lee, ███████████████████████

_____

[17] Even if the district court's analysis of Jakobsson's testimony were construed as a *Daubert*-type ruling on admissibility, which it was not, it is doubtful that such an analysis would be improper at the class certification stage. *See Dukes*, 131 S. Ct. at 2553-54; *Ellis*, 657 F.3d at 982. Whether styled as *Daubert* analysis or a straightforward application of Rule 702, the district court would be authorized to determine whether an expert "applie[d]" the expert's "principles and methods to the facts of the case." Fed. R. Evid. 702(d).

███████████████████████████████████████ (ER 1571.)[18]

Whatever the division of labor among Plaintiffs' retained experts, Plaintiffs were required to offer evidence of a workable methodology for determining liability and damages on a classwide basis. Because they did not do so, their *post hoc* arguments about their alternative expert cannot create an abuse of discretion.

Plaintiffs also suggest that a classwide methodology for determining liability and damages may be possible ████████████████████████████████ ████████████████████████████ (AOB 39 n.7.) █████████ ████████████████████████████ cannot satisfy Plaintiffs' burden of identifying a methodology for proving, on a classwide basis, whether and in what circumstances Facebook billed for clicks that supposedly would be considered "invalid" under yet-to-be-identified "industry standards."

Finally, Plaintiffs contend that "the need for individualized damages does not defeat class certification." (AOB 42.) But the district court's findings were not limited to damages; the court found that Plaintiffs failed to show that they could prove *liability* on a classwide basis. And the court also properly applied the

---

[18] *See also* ER 1573 ███████████████████████████████████████████ ██████████ ; *ibid.* ███████████████████████████████████████████ ██████████████████████████████ ER 1574 ██████████████████████ ████████████████████ ER 1576 ████████████████████████████████████ ████████████████ .

law of the Ninth Circuit on damages, noting that the need for individualized

damages, standing alone, generally cannot defeat class certification, but can be a

factor in the predominance analysis. (ER 19.) *See Lane v. Facebook, Inc.*, 696

F.3d 811, 824 n.5 (9th Cir. 2012); *Funeral Consumers Alliance, Inc. v. Serv. Corp.*

*Int'l*, 695 F.3d 330, 350 n.16 (5th Cir. 2012). For all of these reasons, Plaintiffs

have failed to show that the district court erred, much less that it abused its

discretion in denying class certification.

## II. The District Court Acted Within Its Discretion In Holding That Price And Fox Did Not Establish That They Were Adequate Representatives

The district court also acted within its discretion in holding that Price and

Fox did not carry their respective burdens of establishing adequacy as class

representatives under Rule 23(a)(4). This presents an independent ground for

affirmance.

"To satisfy constitutional due process concerns, absent class members must

be afforded adequate representation before entry of a judgment which binds them."

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Rule 23(a)(4) thus

requires that the "representative parties will fairly and adequately protect the

interests of the class." The district court properly found Price and Fox to be

inadequate class representatives because they are subject to unique defenses, have

unique interests, and (with respect to Fox) are uninformed about this case.

### A.  Price and Fox Are Subject to Unique Defenses

"[A] named plaintiff's motion for class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks omitted);[19] *see also J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980).  This rule avoids the problem created when a named plaintiff's "unique background and factual situation require him to prepare to meet defenses that are not typical of the defenses which may be raised against other members of the proposed class." *Hanon*, 976 F.3d at 508.[20]

Both Price and Fox are subject to "individualized defenses that are potentially dispositive of their claims."  (ER 10.)  Neither attempted to show that

---

[19] This Court held that the unique defenses in *Hanon* precluded certification based on the typicality requirement of Rule 23(a)(3), and did not analyze whether the named plaintiff was also inadequate under Rule 23(a)(4).  "District courts within the Ninth Circuit have applied [*Hanon*] in assessing both the adequacy of a proposed class representative and the typicality of his or her claims." *Welling v. Alexy*, 155 F.R.D. 654, 658 (N.D. Cal. 1994).

[20] Plaintiffs fail to cite *Hanon*, and instead rely on unpublished district court cases for the rule that a unique defense "is an impediment to certification only where it is ... likely to become a major focus of the litigation."  (AOB 43.)  This argument fails.  Although *Hanon* predicted that the defense at issue there was likely to be "a major focus of the litigation," 976 F.2d at 509, it did not establish a "major focus" test.  Moreover, the defenses here *are* likely to become a major focus of the litigation.  *See infra* p. 51.  And, in any event, the cases cited by Plaintiffs support the district court's decision here.  *See infra* pp. 51-52.

he disputed his "cost-per-click" charges within the 30-day period as required by their individual contracts. (*Ibid*.) Although Plaintiffs try to dismiss this point by arguing that the "contractual [waiver] provision was not even adopted until July 2011—two years *after* the named plaintiffs … stopped advertising on Facebook" (AOB 43 (citing ER 83)), the single record page they cite establishes the opposite. The cited declaration by a Facebook advertising manager states that "This provision was in effect throughout the proposed class period." (ER 83; *see also* ER 114.)[21] Plaintiffs do not contend—and never have contended—that they disputed their charges within the required 30 days. (*See* AOB 43-44.)

The district court also properly found that neither named Plaintiff "has attempted to show that he suffered any concrete injury from specific 'invalid' clicks." (ER 10.) Indeed, both Plaintiffs repeatedly refused to respond to discovery requests asking them to identify the "invalid" clicks for which they believed they were overcharged. (ER 71, 154-157, 168-169.) Although Plaintiffs contend that one of their experts, Dr. Bernard Jansen, was deposed on this subject (AOB 42-43), they ██████████████████████████████████

---

[21] Plaintiffs asserted below that the waiver requirement "was not in the Payment Terms Document until July 2011" based on testimony from the advertising manager's deposition. (CR No. 284 at 19.) Plaintiffs have apparently abandoned this argument on appeal. In any event, the manager said nothing of the sort, but testified that he was not aware of any versions of the Payment Terms that did *not* include the waiver language. (ER 34-38.) The district court was entitled to credit this testimony, especially given Plaintiffs' failure to adduce contrary evidence.



(ER 1458-1462, 1487.) ████ (ER 1487.)[22]

In view of these defenses, there is a serious "danger that absent class members will suffer" because Fox and Price will be "preoccupied with defenses unique to" them. *Hanon*, 976 F.2d at 508. Facebook intends to litigate both defenses against Fox and Price, and those defenses are therefore likely to become a "major focus of the litigation." (AOB 43.) It is conceivable that Facebook will obtain summary judgment against Fox and Price based on these defenses—a result that would leave the class unrepresented.

Plaintiffs inexplicably counter with two cases where district courts exercised discretion to deny class certification where the named plaintiff was vulnerable to a unique defense. (AOB 43.) In *Tourgeman v. Collins Financial Services, Inc.*, 2011 WL 5025152, at *12 (S.D. Cal. Oct. 21, 2011), the court held that the named plaintiff was "subject to the unique defense" that the defendant's conduct had not

---

[22] ████ (ER 1604-1618.)

caused his injury, which gave "rise to a conflict of interest that prevent[ed] Plaintiff from adequately representing the interests of the class." And *Williams v. Oberon Media, Inc.*, 2010 WL 8453723, at *6 (C.D. Cal. Apr. 19, 2010) held that the named plaintiffs did "not meet the ... adequacy requirements" with respect to a claim for deceptive trade practices under New York law because they were "subject to unique defenses" including that they did not reside in New York and had not transacted business there.[23] Both cases support the district court's holding.

## B. Price and Fox Have Unique Interests

The district court also acted within its discretion in finding that "the interests of Price and Fox are different than those of other class members"—a factor that weighs against adequacy. (ER 10.) Plaintiffs try to dismiss this point as irrelevant at the class certification stage,[24] but it is well established that Rule 23(a)(4) requires a named plaintiff to possess interests that are aligned with those of his fellow class members. "The adequacy inquiry under Rule 23(a)(4) serves to

---

[23] The language Plaintiffs cite from an unpublished decision from Pennsylvania does not even relate to the adequacy requirement of Rule 23(a); it concerns the predominance inquiry of Rule 23(b). *See Ritti v. U-Haul Int'l, Inc.*, 2006 WL 1117878, at *11 (E.D. Pa. Apr. 26, 2006).

[24] Plaintiffs punch at shadows when they argue that the district court erroneously held that "diversity" was a factor under Rule 23(a). (AOB 44.) The court held no such thing, but simply recognized that Rule 23(a)(4) requires adequacy of representation, and found that Price and Fox were not adequate representatives because their interests diverged from those of other members of the large and "diverse" proposed class. (ER 10.)

uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  Class representatives must "possess the same interest ... as the class members." *Id.* at 625-26 (quotation marks omitted); *see also In re GPU Antitrust Litig.*, 253 F.R.D. at 489.

Here, the interests of Price and Fox differ markedly from those of the class they seek to represent, along multiple dimensions.  Price and Fox are both Self Service Advertisers and thus cannot be expected to represent the interests of Direct Advertisers, who "contract directly with Facebook on different terms, and use different channels to manage their ongoing Facebook advertising campaigns."  (ER 10.)  Price and Fox also are small, low-budget advertisers, who spent only a few hundred dollars on advertisements with Facebook.  By contrast, the proposed class includes "large sophisticated corporations" (*ibid.*) that run costly and expansive advertising campaigns on Facebook and likely on other advertising platforms. Finally, Price and Fox have stopped advertising on Facebook, and Price has shuttered his business entirely.  The putative class, by contrast, includes all people and entities that currently are contracting with Facebook for pay-per-click advertising.  The interests of current advertisers, who have an ongoing and beneficial relationship with Facebook, cannot be adequately represented by Plaintiffs, who severed their ties with the company years ago. *Cf. Windsor*, 521

U.S. at 625-26 (conflicts exist between class members with current injuries and those who might suffer injury in the future); *Andrews Farms v. Calcot, Ltd.*, 2009 WL 1211374, at *11 (E.D. Cal. May 1, 2009) (class representatives failed to satisfy Rule 23(a)(4) where there was a conflict of interest between former members of a cooperative and present or future members).

Plaintiffs err in contending that the district court's adequacy determination "was internally inconsistent with its conclusion that Plaintiffs' claims were typical of those of absent class members." (AOB 44.)  As the Supreme Court has explained, the "typicality" requirement of Rule 23(a)(3) may sometimes "merge with the adequacy-of-representation requirement" of Rule 23(a)(4), but the adequacy requirement "also raises concerns about the competency of class counsel and conflicts of interest." *Dukes*, 131 S. Ct. at 2551 n.5 (quotation marks omitted); *see also* 1 Newberg on Class Actions § 3:32 (5th ed. 2012) (explaining "the differences between the two inquiries" and noting that "adequacy focuses on evaluating the incentives that might influence the class representative in litigating the action, such as conflicts of interest").  Even where typicality is met, the court still may find the named plaintiffs inadequate under Rule 23(a)(4)—especially when confronted with unique defenses and divergent interests of the sort found

here (ER 9-11). *See, e.g.*, *In re Beer Distribution Antitrust Litig.*, 188 F.R.D. 549, 553-55 (N.D. Cal. 1998).[25]

### C. Fox Lacked Sufficient Knowledge to Serve As Class Representative

Finally, the district court was within its discretion in holding Fox to be inadequate because he "knows essentially nothing about the case, and indicated that he would defer to counsel in prosecuting this action." (ER 11.) Courts "have properly denied class certification where the class representatives had so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 525 (C.D. Cal. 2012) (citation omitted). Although a representative need not have "fine-grained knowledge" of the details of the case, Rule 23 requires at least that he "understand the gravamen of the claim." *Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*, 249 F.R.D. 334, 349 (N.D. Cal. 2008) (citation omitted).

Fox's testimony showed outright ignorance of the claims on which he proposed to represent the class. He repeatedly confessed ignorance about even the most basic issues in this case, admitting that "I'm not sure what types of clicks are involved in the lawsuit" (ER 217) and "I don't know what's a valid click and

---

[25] To the extent this Court finds tension in the district court's application of Rule 23(a)(3) and 23(a)(4), it should hold that Plaintiffs have failed to satisfy both the typicality and the adequacy requirements. *See Sussman*, 186 F.3d at 1203.

what's an invalid click" (ER 218). Other than reiterating that "Facebook charged

me for invalid clicks" (ER 61), he could not offer specifics about his claims. He

did not know whether his claims extend to clicks from non-human sources known

as "bots," or to multiple clicks from the same Facebook user. (ER 219-222.)

Rather, he planned to defer entirely to his counsel on these and other important

issues:

> My understanding is that we were charged for things that
> we should not have been charged for. I think that it's
> going to be up to the experts and lawyers to figure out—
> what that really was.

(ER 63; *see also* ER 221-222.)

Plaintiffs suggest that a class representative need not have *any* knowledge of

a case in order to satisfy the adequacy requirement, noting that "[m]ost courts in

this Circuit have found the plaintiff's knowledge about the case to be irrelevant for

adequacy purposes." (AOB 44.)[26] That is as wrong as it sounds. In fact, "[t]he

most common challenges to a proposed representative's qualifications involve her

knowledge of the case." 1 Newberg on Class Actions § 3:67. And courts in this

Circuit and across the country have recognized that a class representative who is

bereft of knowledge about a case cannot be adequate. *See, e.g.*, *Keegan*, 284

---

[26] In *In re Live Concert Antitrust Litigation*, 247 F.R.D. 98, 118 (C.D. Cal. 2007), cited by Plaintiffs, the court merely noted that it knew of no Ninth Circuit case that imposed such a requirement, but then went on to consider whether the named plaintiff had demonstrated "sufficient knowledge of the litigation." *Id.* at 121.

F.R.D. at 525; *Californians for Disability Rights*, 249 F.R.D. at 348-49; *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007) (class representative must possess a "minimal degree of knowledge"); *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 483 n.18 (5th Cir. 2001) ("Plaintiffs should understand the actions in which they are involved.").

Nor may Plaintiffs establish adequacy by asserting, as they do here, that not much knowledge is needed to be a representative in this case. Although some district courts have said that "[t]he threshold of knowledge required to qualify a class representative is low," *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 611 (N.D. Cal. 2004), they also have recognized that a Plaintiff such as Fox who is unfamiliar with the basic aspects of the case cannot satisfy Rule 23(a)(4), *see ibid.* The question here is whether it was an abuse of discretion for the district court to conclude that Fox's startling unfamiliarity with the case placed him within that category. On the record before the court, it was not.

## CONCLUSION

For all of the foregoing reasons, this Court should affirm the district court's Order denying Plaintiffs' motion for class certification.

DATED: March 5, 2013

MUNGER, TOLLES & OLSON LLP
  KRISTIN LINSLEY MYLES
  JONATHAN H. BLAVIN
  MICHAEL J. MONGAN

COOLEY LLP
  MICHAEL G. RHODES
  WHITTY SOMVICHIAN


By: *Kristin Linsley Myles* / JHB
    KRISTIN LINSLEY MYLES

Attorneys for Defendant-Appellee
FACEBOOK, INC.

## STATEMENT OF RELATED CASES

Appellees are not aware of any related cases.

## CERTIFICATE OF COMPLIANCE

I certify pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32-1 that the attached brief is proportionately spaced, has a typeface of 14 points, and contains 13,639 words.

Dated:  March 5, 2013

_____
Kristin Linsley Myles